## WEIN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

David Gevas (B-41175),      )
                              )
              Plaintiff,    )
                              )      Case No. 20 C 3667
           v.           )
                              )      Hon. Mary M. Rowland
Joe Sheehy, et al.,          )
                              )
          Defendants.   )

## <u>MEMORANDUM OPINION AND ORDER</u>

David Gevas, an Illinois prisoner, initiated this *pro se* civil rights action under 42 U.S.C. § 1983 concerning delays in his receipt of prescription medications as well as medical supplies and devices while incarcerated at the Stateville Correctional Center. His claims arise against two categories of defendants, employees of the Illinois Department of Corrections (IDOC) and healthcare providers who contracted with or are employed by Wexford Health Sources, Inc. For present purposes, the Court focuses on the claims against the Wexford Defendants: Wexford Health Sources, Inc. (Wexford), Dr. Okezie, and Dr. Henze.

Gevas contends that the Wexford Defendants violated the Eighth Amendment because they were deliberately indifferent to his serious medical needs and that one of the Defendants, Dr. Okezie, retaliated against him for filing grievances. The Wexford Defendants, for their part, deny the allegations and have moved for summary judgment on all claims against them. Dkt. 421. For the following reasons, Defendants' motion [421] is granted.

### SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any

material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted).

The Court considers relevant, properly supported evidence "in the light most favorable to the non-moving party." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (citation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). The Court draws all reasonable inferences in the non-moving party's favor, but not speculative inferences. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. The procedures set out in L.R.56.1 "serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019) (citation omitted). The Court may require strict compliance with L.R. 56.1 from all parties. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) (citing *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)).

2

The Court limits its analysis to facts that are presented in compliance with L.R.56.1. This means that the Court will not consider facts or objections to facts that are not identified in the parties' L.R.56.1 statements and adequately supported. *Kreg Therapeutics, Inc.*, 919 F.3d at 415 ("it is not the duty of the district court to scour the record in search of material factual disputes") (citations omitted). Unsupported facts, bald statements lacking factual support, and facts supported only by inadmissible evidence are insufficient to avoid summary judgment; "a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion." *Albiero v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir.2001) (internal quotation marks and citation omitted).

## BACKGROUND

The events giving rise to the claims in this case occurred at the Stateville Correctional Center. Dkt. 424, Defts. L.R.56.1 Stmt. of Facts (DSOF) ¶ 4. The claims are varied but broadly concern Gevas's medical care spanning a period from 2011 through April 24, 2019, DSOF ¶ 3, when he was transferred out of Stateville, Dkt. 424-1, Wexford Ex. A, Gevas Dep. Tr. 6:21-23.

Defendant Wexford contracts with the State of Illinois to provide medical services to inmates at IDOC facilities. DSOF ¶ 7. The contract commenced on May 16, 2011, and is ongoing. Dkt. 451, Pl.'s L.R. 56.1 Stmt. of Add'l Facts (PSOF) ¶ 31. Under the contract, Wexford is to provide medical, dental, vision, pharmaceutical and mental health services for inmates at Stateville. PSOF ¶ 32. The contract also specifies that Wexford shall provide pharmacy services, including among other things: "ordering, stocking, supplying and managing medications" and "clinical pharmaceutical support services." PSOF ¶ 34. Wexford's on-site medical director "shall

3

coordinate with [the facility's] healthcare unit administrator in the execution of the duties under the contract" in addition to providing "primary healthcare services on a routine basis." PSOF ¶ 39.

Defendant Dr. Okezie was Wexford's on-site medical director at Stateville in 2018, until he left in October 2018. DSOF ¶ 5.[1] Defendant Dr. Henze was Wexford's on-site medical director at Stateville from October 8, 2018, through April 2019. DSOF ¶ 6.

### A. Missed Medications

According to the Wexford Defendants, Stateville's on-site pharmacy is separate from the healthcare unit. DSOF ¶ 15. Stateville contracts with Boswell Pharmacy, a separate entity, to fill prescription orders for inmates. DSOF ¶ 14. For inmates to obtain prescription medications, a Wexford physician must write an order for the medication. DSOF ¶ 12. Another individual then sends the order to Boswell. DSOF ¶ 12. The person responsible for sending medication orders to Boswell was employed by IDOC, not Wexford. DSOF ¶¶ 10, 13.

Medication shortages occur at Stateville for various reasons, just like medication shortages occur at pharmacies used by nonincarcerated individuals. DSOF ¶ 21. Dr. Okezie testified at his deposition that, if a medication is out of stock, the pharmacy should notify him so that they could discuss an alternative. DSOF ¶ 24. If the pharmacy notified him that a medication was out of stock, there would be a note in the prisoner's chart. DSOF ¶ 25. If an inmate has been on an ongoing, long-term medication that is about to expire, a member of the healthcare team generally would notify the physician. PSOF ¶ 26.

---

[1]The parties do not identify Dr. Okezie's start date, but publicly available information shows that another physician was employed as Wexford's medical director at Stateville prior to December 23, 2017. *Gevas v. Obaisi*, No. 16-cv-10599, 2022 WL 17082526, at *1 (N.D. Ill. Nov. 18, 2022) (Rowland, J.).

According to Gevas, his watch-take medications such as Remeron, Depakote, Tramadol, Melatonin, Eliquis, Amiodarone, Neurontin, Lyrica, and Coumadin expired or were out of stock "over 250 times" from 2011 through 2019. PSOF ¶¶ 1, 3. Gevas, however, specifically accounted for just 62 days when he did not receive one or more medications between May 24, 2017, and March 25, 2019. PSOF ¶ 4.[2] The most-often missed medication was Melatonin (36 days in 22 months), and the longest lapse was for Melatonin, seven straight days (from May 24, 2017 to May 30, 2017). PSOF ¶ 4. The second most-missed medication was Lyrica, a pain medication, for a total of 15 days in 22 months. PSOF ¶ 4.

Documents submitted by Gevas reflect that he submitted grievances to the "HCU" about his missed medications and often received responses indicating that the issue had been addressed with "healthcare staff" and directing Stateville wardens to ensure that watch-take medications do not run out of stock. PSOF ¶ 2. Of the medications missed, grievance responses show that lapses were intermittent and promptly resolved, often the same or next day. *See* Dkt. 452-5, Gevas Ex. 12, Dkt. 452-11, Gevas Ex. 24; *see* PSOF ¶ 1. Gevas says he experienced pain, heart palpitations, dizziness, shortness of breath, anxiety, nausea, depression, irritability, and hopelessness when he did not timely receive his medications. PSOF ¶¶ 16, 28-30.

---

[2]Gevas cites to his unsigned, unattested Declaration for many of his proposed facts. *See* Dkt. 451, 452. Even though the Declaration does not comply with 28 U.S.C. § 1746, the Court has considered cited portions of the Declaration so long as they are relevant, admissible, and Gevas could testify to the fact at trial. The Court has not, however, dug through Gevas's exhibits to identify facts that are not explicitly identified in his L.R.56.1 Statement of Additional Facts. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."). The Court notes that none of the cited evidence supports Gevas's contention that Lyrica was prescribed three times a day, so the Court has not included the supposedly missed afternoon dose in its calculation.

### B. CPAP Machine

Gevas received a CPAP (continuous positive airway pressure) machine and tubing in August 2017, presumably for sleep apnea. DSOF ¶¶ 26, 54. Wexford has no written guidelines or policies concerning CPAP machines for Illinois inmates. DSOF ¶¶ 28, 29. Dr. Fisher, who was deposed as Wexford's Rule 30(b)(6) witness, opined that CPAP machines do not require a humidifier. DSOF ¶ 27. Dr. Okezie, on the other hand, opined that "some" CPAP machines need a humidifier "[f]or the purpose it was prescribed." PSOF ¶ 22 (citing Dkt. 424-1, Wexford Ex. E, Okezie II at 26:7-27:3). CPAP machines at Stateville do not have humidifiers. DSOF ¶ 30.

On January 25, 2019, Dr. Henze referred Gevas's requests for CPAP supplies to Stateville's Health Care Unit Supply Supervisor Joe Sheehy. DSOF ¶ 67 (citing Dkt. 424-1, Wexford Ex. G). Dr. Henze's notes do not mention a humidifier. *See* Dkt. 424-1, Wexford Ex. G.

IDOC employee Sheehy was responsible for providing CPAP machine supplies to inmates. *See* DSOF ¶ 31. Gevas produced a user manual for a Philips Respironics DreamStation Sleep therapy system that, he says, he gave to Sheehy. PSOF ¶ 18. The manual recommends the machine's tubing be cleaned daily with a solution of warm water and mild detergent. Dkt. 452-5, Gevas Ex. 14; *see* PSOF ¶ 18. Warm water and liquid dish soap are recommended for "the 15 or 22mm flexible tubing," but users are cautioned against using "solutions containing conditioners or moisturizes" in general. Dkt. 452-5, Gevas Ex. 14; *see* PSOF ¶¶ 18, 20. The manual refers users to "the humidifier manual for the instructions on how to clean the optional heated tube." Dkt. 452-5, Gevas Ex. 14. The manual recommends replacing disposable filters twice a month and reusable filters every six months, noting that the schedule provides only "general guidelines . . . replacement schedule will vary[.]" Dkt. 452-5, Gevas Ex. 14.

Receipts signed by Gevas show that he received: one disposable filter on November 3, 2017; one disposable and one reusable filter on February 16, 2018; two disposable filters on April 17, 2018; and two disposable filers on June 1, 2018. DSOF ¶¶ 55-58; Pl. Resp to DSOF ¶¶ 55-58. Gevas also received two disposable filters on July 24, 2018; three disposable filters and soap on September 10, 2018; three disposable filters and soap on November 13, 2018; two disposable filters, one reusable filter, and eight ounces of soap on January 2, 2019; six disposable filters and eight ounces of soap on February 12, 2019. DSOF ¶¶ 63-66, 69. Even so, Gevas contends he received inadequate supplies of "disposable filters" and liquid soap, which caused him to develop sores around his lips and in his mouth and a "ground glass" nodule in his lung, that was diagnosed in November 2017 (or before either Dr. Okezie or Dr. Henze were at Stateville). PSOF ¶¶ 23, 24.

### C. The Oncologist's Recommendations: Therapeutic Shoes, Air Mattress, and Norco

From time to time, Wexford's on-site physicians may consult with a specialist. DSOF ¶ 46. Specialists are not part of the inmate's primary care team, so the specialist's opinions are considered recommendations, not orders. *See* DSOF ¶ 47.

On March 7, 2019, Gevas was seen by Dr. John Galvin, an oncologist at the University of Illinois (UIC). DSOF ¶ 70. Dr. Galvin noted that Gevas had a history of Stage IV cancer, low back pain with neuropathy, and atrial fibrillation, but "no evidence of recent disease on PET/CT scans." DSOF ¶ 70. Dr. Galvin's notes reflect, as relevant to Gevas's claims in this case: "orthopedic shoes"; "air mattress"; "Continue norco prn[.]" DSOF ¶ 70; Dkt. 424, Wexford Ex. G. Dr. Henze prescribed orthopedic shoes for Gevas on March 11, 2019, and confirmed on April 11, 2019, that the order had been "completed." DSOF ¶¶ 71, 74.

7

Wexford does not have guidelines for prescribing air mattresses to inmates, so the decision to order a special mattress is left to the physician's discretion. DSOF ¶ 41. Ordering a mattress for an inmate's complaints of pain does not implicate standard of care issues. DSOF ¶ 42. Mattresses do, however, raise security concerns, which Wexford physicians consider when making decision about mattresses. *See* DSOF ¶¶ 43, 44. Dr. Henze's notes from March 11, 2019, reflect that she planned to order an egg crate mattress, also known as a convoluted pad, for Gevas. DSOF ¶ 71; Pl. Resp. to DSOF ¶ 71. She chose an egg crate mattress rather than an air mattress because, she attested, air mattresses were not allowed in the cell house. DSOF ¶ 71. On March 21, 2019, Gevas received an egg crate mattress. DSOF ¶ 73.

The Wexford Defendants submitted evidence that Wexford's on-site doctors are qualified to treat inmate's complaints of pain. DSOF ¶ 49. The inmate's medical needs as well as Stateville's policies are considered when choosing how to treat pain. *See* DSOF ¶ 50. According to Drs. Fisher and Henze, Norco may only be prescribed to inmates in Stateville's infirmary. DSOF ¶ 50. An inmate is not allowed to have Norco after he leaves the infirmary. DSOF ¶ 51.

Dr. Henze saw Gevas on March 11, 2019, after Gevas's appointment with Dr. Galvin. DSOF ¶ 71. Dr. Henze noted that Norco was not allowed in Stateville cell house and advised Gevas that he would have to be housed in the infirmary to receive Norco, which is disputed. DSOF ¶ 71; Pl. Resp. to DSOF ¶ 71. Dr. Henze prescribed Tylenol 3 in lieu of Norco. DSOF ¶ 71.

When Gevas saw Dr. Henze on April 11, 2019, Gevas told her that his pain was not controlled by his present dose of Tylenol 3 and asked for the dosage to be increased from two times a day to three times a day. DSOF ¶ 74; Pl. Resp. to DSOF ¶ 74. Dr. Henze explained that three-times-a-day dosing in the cell house was being discontinued because it was being abused.

DSOF ¶ 74. She then continued Tylenol 3—a narcotic pain medication—twice a day and planned to follow-up with Stateville's Nursing Director. DSOF ¶ 74.

### D.  Eliquis v. Coumadin

Dr. Okezie saw Gevas on June 19, 2018, and intended to renew all of Gevas's then-existing medications. DSOF ¶ 59. The next day a Wexford cardiologist recommended that Gevas be switched from Eliquis to Coumadin. DSOF ¶ 60. Dr. Okezie therefore ordered Coumadin along with Lovenox injections because Lovenox is commonly used as a bridge between the two medications. DSOF ¶¶ 60, 62. Dr. Okezie's notes reflect a plan to monitor Gevas's clotting factor blood levels (INR) and to stop Lovenox when Gevas's INR factor reached 2.0. DSOF ¶ 62. Dr. Okezie had used Coumadin with other patients and found the treatment effective. DSOF ¶ 61.

According to Gevas, when he sought clarification about the change from Eliquis to Coumadin on June 20, 2018, Dr. Okezie said that a UIC cardiologist had ordered the change but later said that a Wexford cardiologist had ordered the change. PSOF ¶ 8. Gevas says that Dr. Okezie also did not tell him that Lovenox injections were prescribed twice a day. PSOF ¶ 8. In addition, Gevas contends that he saw Dr. Okezie on "07/20/2018," at which time Dr. Okezie told him that the pain and bruising from the Lovenox injections were to remind him not to file more grievances about his watch-take medications. PSOF ¶ 12. Medical records cited by Gevas do not reflect an appointment with Dr. Okezie on July 20, 2018. *See* Dkt. 452-2, pg. 11-13. Dr. Okezie denies he ordered Lovenox injections as retaliation for Gevas filing grievances. DSOF ¶ 62.

### ANALYSIS

Gevas alleges in the operative complaint that the Wexford Defendants violated the Eighth Amendment because they were deliberately indifferent to his serious medical needs (Counts I-III,

V-VII). Dkt. 32; *see also* Dkt. 31, Jan. 13, 2021 Order. Gevas also contends that Dr. Okezie violated the First Amendment when, in retaliation for Gevas filing grievances about Eliquis being out of stock, he changed Gevas's prescription from "Eliquis to Lovenox" (Count IV). *Id.* The Wexford Defendants' argument for summary judgment can be summed up as follows: Evidence properly before the Court does not suggest that Wexford, Dr. Okezie, or Dr. Henze were deliberately indifferent to Gevas's serious medical needs or retaliated against him in violation of the First Amendment. *See* Dkt. 422, Defts. Mem. in Supp. of Mot. for Summ. J.

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). To prevail on a claim that his medical care violated the Eighth Amendment, a prisoner must be able to prove: (1) that he suffered from an objectively serious medical condition and (2) that the defendant knew about and was deliberately indifferent to the condition. *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (quoting citations and quotations marks omitted).

A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks and citation omitted). It is undisputed that Gevas suffers from several serious medical conditions, but the only conditions evidenced in the record are a history of Stage IV cancer, low back pain with neuropathy, atrial fibrillation, and sleep apnea. The Court will accept for present purposes that these conditions are serious, but success on a medical claim under the Eighth Amendment requires more than the mere existence of a serious medical condition.

To be held liable for an Eighth Amendment violation, a plaintiff "must provide evidence" that each defendant "actually knew of and disregarded a substantial risk of harm." *Lockett*, 937 F.3d at 1023 (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)) (emphasis in original). "[N]egligence or even medical malpractice" is not deliberate indifference. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "The standard for deliberate indifference essentially is one of criminal recklessness." *Boykins v. Wilson*, No. 23-3027, 2025 WL 48413 *2 (7th Cir. Jan. 8, 2025) (citing *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019)).

Given the breadth of the operative complaint, the Court considers Gevas's claims in the order presented by the pleading:

**Count I.** Gevas alleged that from 2018[3] through April 2019 he requested a humidifier for his CPAP machine, but Drs. Okezie and Henze refused to provide a humidifier. Dkt. 32, pg. 3; Dkt. 453, Pl. Mem. in Opp. to Mtn for Summ. J., pg. 1-2. Gevas also alleged that Dr. Okezie and Henze refused to "resolve" problems he experienced when attempting to obtain filters and soap for the machine. *Id.* Gevas pointed to no evidence showing that Dr. Okezie knew about his requests for a humidifier or CPAP machine supplies. Dr. Henze, on the other hand, knew about Gevas's requests and permissibly referred the requests for supplies to Stateville's supply supervisor. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("no prisoner is entitled to insist that one employee do another's job").

As to the humidifier, there is a dispute about Dr. Henze's efforts to obtain a humidifier for Gevas's CPAP machine, but that dispute is not enough to survive summary judgment because

---

[3]Gevas alleged in his complaint that Drs. Okezie and Henze denied him a humidifier and CPAP supplies beginning in September 2017, but neither Drs. Okezie nor Henze were employed at Stateville in 2017.

Gevas pointed to no evidence establishing that *his* CPAP machine required a humidifier to treat the only medical condition for which the machine presumably was prescribed, sleep apnea. Instead, he identified testimony from Dr. Okezie that *some* CPAP machines require a humidifier.

Gevas also pointed to no evidence that the lack of a humidifier or supplies (in the quantities recommended but not required for his CPAP machine) could cause a ground-glass nodule in his lung. *See Meneweather v. Ritz,* No. 24-1214, 2025 WL 66040, at *3 (7th Cir. Jan. 10, 2025) ("a plaintiff claiming injury has the burden to offer some evidence of causation"); *see* Def. Resp. to PSOF ¶ 23 (contesting causation). And, in any event, an attempt to link the nodule to Drs. Okezie and Henze fails since the nodule was diagnosed in November 2017, or before either Drs. Okezie or Henze began treating Gevas.

In addition, Gevas identified no evidence that the lack of a humidifier or supplies caused sores around his lips and in his mouth that were serious enough to support an Eighth Amendment claim. *See Lockett,* 937 F.3d at 1022-23 (explaining that an objectively serious medical condition is one that has been "diagnosed [] as requiring treatment or the need for treatment would be obvious to a layperson") (internal quotation marks omitted). Thus, even if Drs. Okezie and Henze could have done more to addresses Gevas's requests, Gevas produced no evidence showing that the doctors disregarded a serious risk of harm when they failed to secure a humidifier and supplies for his CPAP machine. Drs. Okezie and Henze are entitled to summary judgment on Count I.

**Count II.** Gevas alleged that from March 11, 2019, through April 24, 2019, Dr. Henzie deliberately and callously refused to provide him with orthopedic shoes, even though the shoes had been recommended by a specialist, Dkt. 32, pg. 3; Dkt. 453, pg. 2-3. The problem is the record does not support Gevas's conclusion. Rather, evidence identified by Gevas shows that Dr. Henze

ordered orthopedic shoes for him on March 11, 2019, and when Dr. Henze follow-up on April 11, 2019, she determined that the order had been "completed." There is no evidence that Dr. Henze was required to do anything more, even though Gevas suggests he did not receive the shoes before he was transferred out of Stateville on April 24, 2019. *See Burks*, 555 F.3d at 595 ("no prisoner is entitled to insist that one employee do another's job"). Dr. Henze is entitled to summary judgment on Count II.

**Count III.** Gevas alleged that, from September 2017 through April 2019, Wexford along with Drs. Okezie and Henze allowed his watch-take medications to run out of stock and did not properly renew prescriptions. Dkt. 32, pg. 3-4; Dkt. 453, pg. 3-4. Drs. Okezie's and Henze's responsibility for oversight of the on-site pharmacy at Stateville is contested as Gevas produced some evidence that Wexford's on-site medical director is responsible for pharmacy operations, but Gevas's claims about lapses in his prescription medications suffer from critical flaws.

First, Gevas attempts to conflate renewal of his prescriptions with out-of-stock medications, but the issues are distinct. No evidence properly before the Court shows that either Dr. Okezie or Dr. Henze were inadequately trained to renew prescription medications or that they failed to renew Gevas's medications when lapses were brought to their attention.

Second, Gevas's sweeping assertion that his medications were allowed to run out of stock "over 250 times" from 2011 to 2019 (supported by citations to over 100 pages of exhibits, many of which do not support his assertion), *see* PSOF ¶ 3, does not comply with the requirements of L.R.56.1. Instead, the Court considers only the lapses specifically identified by Gevas, or 62 days on which he says he missed one or more doses of medication, from May 24, 2017, to March 25, 2019. PSOF ¶ 4.

13

Documents submitted by Gevas suggest that he received many of the missed medications 12 to 48 hours later. He experienced missed doses of Melatonin most frequently, but he submitted no evidence that relatively short, infrequent lapses in Melatonin (36 days in 22 months) were sufficiently detrimental to his health to support an Eighth Amendment claim. The same can be said of this second most frequently missed medication, Lyrica (15 days in 22 months).

The record also is devoid of evidence showing that the missed medications—*i.e.*, 62 days over 22 months where Gevas missed one or more doses of various medications that often were administered 12 to 48 hours later—endangered Gevas's health or caused other more serious health problems. The Seventh Circuit explained in *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013): "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of the failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." Where a prisoner contends that prison personnel "delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm," which means that the "plaintiff must offer medical evidence" showing that the delay was detrimental. *Id.* (citation omitted).

Applying the rule set out in *Jackson*, the Seventh Circuit rejected the contention that a three-week lapse in calcium channel blockers for an inmate diagnosed with hypertension rose to the level of a Constitutional violation. *Id.* at 788-789. The Seventh Circuit considered that the inmate's blood pressure before the interruption in his medication was 112/82, rose to 142/78 during

14

the interruption, and was 114/72 after the medication was resumed. *Id.* Even so, the Court explained, "the slight elevation above the normal range" was not enough to establish that his long-term health had been endangered. *Id.* The Court then concluded that the inmate's lawsuit was "plainly meritless." *Id.* at 790.

Defendants raised causation in their opening brief. Dkt. 422 at 6-7. Consequently, Gevas was required to submit admissible medical evidence supporting his contention that he suffered a redressable injury because of the medication lapses. *See Meneweather*, 2025 WL 66040, at *3 ("a plaintiff claiming injury has the burden to offer some evidence of causation"). His failure on this issue is dispositive to his personal capacity claims against Drs. Okezie and Henze as well as his *Monell* claim against Wexford Health Sources, Inc.[4] This is so even though Gevas broadly asserts that he experienced "unnecessary pain" because of his missed medications, many of which had nothing to do with pain management. *See* Dkt. 453, pg. 3; PSOF ¶ 5. The Wexford Defendants are entitled to summary judgment on Count III.

**Count IV.** Gevas contends that, in retaliation for his filing grievances about Eliquis being out of stock, Dr. Okezie changed his prescription for Eliquis to a prescription for Lovenox on June 20, 2018. Dkt. 32, pg. 4; Dkt. 453, pg. 4-5, 10. The events precipitating Gevas's retaliation claim started on June 19, 2018. Dr. Okezie testified that he intended to renew Gevas's then-existing medications, including Eliquis, but the next day a cardiologist recommended a switch from Eliquis to Coumadin. Dr. Okezie therefore ordered Lovenox injections because Lovenox is commonly used as a bridge between the two medications. Dr. Okezie also put in place a plan to monitor Gevas's clotting factor blood levels (INR) and to stop Lovenox when Gevas's INR factor reached

---

[4] Any claim against Drs. Okezie and Henze in their role as medical director, is the same as a *Monell* claim against Wexford. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1062, 1071 (7th Cir. 2012).

2.0. According to Gevas, one month later, on "07/20/2018," Dr. Okezie told him that the pain and bruising from the Lovenox injections were to remind him not to file more grievances about his watch-take medications. Dr. Okezie denies this statement.

A prison official may not retaliate against an inmate because he filed grievances. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). To establish retaliation under the First Amendment, an inmate must show that he engaged in protected activity, a deprivation occurred to deter the protected activity, and the protected activity was at least a motivating factor in the decision to take retaliatory action. *Id.* (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)). Once a prima facie case is established—that is, once the inmate shows that the protected activity was at least a motivating factor for the retaliatory conduct—the burden shifts to the defendant to show that the activity would have occurred regardless of the protected activity. *Id.* (citing *Kidwell,* 679 F.3d at 965). If the defendant satisfies his burden, the inmate then must demonstrate that the proffered reason is pretextual. *Id.*

Filing a grievance is a protected activity and alleging that a medical provider vengefully inflicted unnecessary pain in response to protected activity is enough to satisfy Gevas's initial burden. *Id.* Thus, Gevas—who could testify to the comments purportedly made by Dr. Okezie, *see* Fed. R. Evid. 801(d)—has produced evidence of a prima facie case of retaliation. But Dr. Okezie also satisfied his burden of rebutting Gevas's claim by offering evidence that he had a valid reason for ordering the Lovenox injections, *i.e.* because Lovenox is commonly used as a bridge between Eliquis and Coumadin.

Gevas makes no argument that Dr. Okezie's reason for the Lovenox injections was pretextual. *See* Dkt. 453, pg. 4-5, 10. At best, Gevas identified a conversation on June 20, 2018—

or more than one month before Dr. Okezie's purported comments about wishing to inflict pain—during which Dr. Okezie allegedly said a UIC cardiologist recommended the change from Eliquis to Coumadin but later said a Wexford cardiologist recommended the change. Dr. Okezie's purported flip-flop on whether the cardiologist was from UIC or Wexford, though, is a distinction without a difference insofar as Gevas offered no evidence to refute Dr. Okezie's testimony that a cardiologist in fact recommended the medication change. *See Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011) ("a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie"). Gevas also produced no evidence suggesting that a change from Eliquis to Coumadin was not medically justified or that Lovenox was not required as a bridge between Eliquis and Coumadin. Instead, Gevas produced Dr. Okezie's notes from June 20, 2018, which corroborate Dr. Okezie's testimony: "Coumadin is ordered by Wexford Consultant Cardiologist." Dkt. 452-5, Gevas Ex. 13; *see* PSOF ¶¶ 7, 8. Dr. Okezie is entitled to summary judgment on Count IV.

**Count V.** Like his claims in Count III, Gevas alleged in Count V that Wexford maintained a pattern or policy of allowing his watch-take medications to run out of stock and did not properly train its employees to properly stock medications. Dkt. 32, pg. 4; Dkt. 453, pg. 6-7. He alleged that his medications were allowed to run out of stock more than 250 times from 2010 through 2019, but evidence properly before the Court fails to establish these allegations, *see supra*, Count III.

Gevas identified just 62 days from May 24, 2017, to March 25, 2019, when he missed one or more doses of his prescription medications that are potentially attributable to pharmacy operations. *See supra*, Count III. Wexford arguably was responsible for pharmacy operations. But Gevas's claim in Count V fails for the same reason his claims in Count III fail; he submitted no

admissible evidence that brief, intermittent lapses in his medications caused a sufficiently serious harm. Wexford is entitled to summary judgment on Count V.

**Count VI.** Gevas alleged that from January 2018 through April 2019, Dr. Henze "deliberately and callously" refused to prescribe an air mattress for his use even though an oncologist recommended an air mattress. Dkt. 32, pg. 4-5; Dkt. 453, pg. 7. Dr. Henze was aware of the oncologist's recommendation and, on March 11, 2019, planned to order an egg crate mattress instead. Gevas then received an egg crate mattress on March 21, 2019.

Gevas presented no evidence that Dr. Henze's decision to prescribe an egg crate mattress in lieu of an air mattress was "so inadequate that it demonstrated an absence of professional judgment." *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021). Gevas challenges Dr. Henze's reasons for denying an air mattress—*i.e.*, that air mattresses were not allowed in the cell house— by stating that he "advised defendant Henze that the 'warden of security' would approve an air mattress overlay in the cell house." Dkt. 453, pg. 7. But Gevas's recitations of what, he says, the warden said is inadmissible hearsay. Dr. Henze also was allowed to substitute a treatment she deemed appropriate, while taking into consideration her understanding of prison policies, without running afoul of the Eighth Amendment. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 764-65 (7th Cir. 2021) (allowing medical professionals to "default to the security needs of the prison unless the medical professional determines that an exemption is required for medical reasons"). This is so even though Gevas's oncologist recommended a different type of cushioning. *See id.* ("as an outside provider, [the inmate's oncologist] was not in a position to assess the security concerns of the prison"). Dr. Henze is entitled to summary judgment on Count VI.

**Count VII.** Gevas alleged that "from about 2017 through April 2019" Drs. Okezie and Henze refused to prescribe pain medications recommended by Gevas's oncologist, Dr. Galvin. Dkt. 32, pg. 5; Dkt. 453, pg. 7-8. As an initial matter, the only evidence of Dr. Galvin's recommendation appears in Dr. Galvin's notes from March 7, 2019. Dr. Okezie was no longer employed at Stateville by March 2019. Thus, there is no evidence calling into question Dr. Okezie's treatment decision with respect to Gevas's complaints of pain. Dr. Okezie is entitled to summary judgment.

That leaves Gevas's contention that the Eighth Amendment required Dr. Henze to prescribe Norco to treat his pain, to the exclusion of all other pain medications. But the Eighth Amendment requires no such thing. *See Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019) ("just because the staff declined to provide him with his desired pain medication . . . does not mean the course of treatment was objectively unreasonable").

Gevas points to Dr. Henze's statement that inmates were required to be in the infirmary to receive Norco. Dkt. 453, pg. 7. Gevas argues that he would have been willing to stay in the infirmary to receive Norco, but Dr. Henze said no beds were available. Dkt. 453, pg. 7-8. This fact, though, does not suggest that Dr. Henze's decision to prescribe Tylenol 3 instead of Norco was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Stewart*, 14 F.4th at 763 (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)).

Gevas also contends that he "explained that the Tylenol 3 and Tramadol was ineffective." Dkt. 453, pg. 8. On this point, facts properly before the Court show that Gevas told Dr. Henze on April 11, 2019, that his pain was not controlled by his present dosage of Tylenol 3 and asked for

19

the dosage to be increased from two times a day to three times a day. Dr. Henze explained that three-times-a-day dosing in the cell house was being discontinued. She then continued Tylenol 3 (a narcotic pain medication) at twice-a-day dosing and planned to follow-up with Stateville's Nursing Director. Less than two weeks later—on April 24, 2019—Gevas was transferred out of Stateville, so he was no longer under Dr. Henze's care.

The mere fact that Dr. Henze failed to arrive at a solution to optimally manage Gevas's pain is not enough to survive summary judgment. *See Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) ("To avoid summary judgment [the nonmovant] must . . . produce more than a scintilla of evidence to support his position."). Deliberate indifference requires a "subjective state of mind akin to criminal recklessness" and must be assessed in light of the "totality of care." *Owens v Duncan*, 788 F. App'x 371, 374 (7th Cir. 2019). The record reflects that Dr. Henze considered the specialist's recommendations—*i.e.*, orthopedic shoes, an air mattress, and Norco—then attempted to find solutions while taking into considerations the limitations of the facility. Even though Gevas continued to experience pain, nothing in the record suggests that Dr. Henze did not exercise her medical judgment when she considered treatment options, including continuing Gevas on Tylenol 3 twice a day. *See Armstead v. Marandet*, No. 20-2891, 2021 WL 5492983, at *2 (7th Cir. Nov. 23, 2021) ("the Eighth Amendment does not guarantee complete pain relief . . . , just the absence of reckless care"); *Leiser v. Hoffman*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("doctors are not deliberately indifferent when they are unable to eliminate completely a patient's pain") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). There also is no suggestion in the facts properly before that Court that Dr. Henze persisted with an

20

ineffective treatment over an extended period. Consequently, Dr. Henze is entitled to summary judgment on Count VII.

## Conclusion

Gevas's claims in this case reflect his dissatisfaction with an imperfect healthcare system, but the evidence does not support a conclusion that the Wexford Defendants were aware of and intentionally disregarded an excessive risk to his health, *see Farmer*, 511 U.S. at 837, or that Dr. Okezie retaliated when he switched Gevas from Eliquis to Coumadin. The Wexford Defendants therefore are entitled to summary judgment.

Dated: February 28, 2025

_____
MARY M. ROWLAND
United States District Judge